DAVID M. DAVIS[1] & others[2] *vs.* ZONING BOARD OF CHATHAM & another.[3]

No. 99-P-480.

Suffolk. December 8, 2000. - August 27, 2001.

Present: PORADA, LAURENCE, & LENK, JJ.

*Zoning,* Special permit, By-law, Nonconforming use or structure, Board of appeals: decision.

On an appeal pursuant to G. L. c. 40A, § 17, from the denial by a town's zoning board of an application for a special permit to convert a former Coast Guard launchway and boathouse (existing nonconforming structures) into a pier facility accommodating boats for recreational purposes, the judge correctly concluded that the pier resulting from the proposed modification of the launchway would not conform to the dimensional requirements of the town's zoning by-law, and that the loss of moorings, increase in navigational congestion, and interference with shellfishing were significantly detrimental effects on the neighborhood, any one of which constituted a permissible reason to sustain the board's decision to deny the special permit, which was neither arbitrary nor capricious. [355-362]

Landowners failed to demonstrate any error in a Land Court judge's rejection of their demand for a declaration that they were entitled to use under a town's zoning by-law an existing launchway and boathouse as a pier and a residence for recreational boating purposes without a special permit, even though recreational boating was a permitted activity in the conservancy district in which the structures were located, and where they had admitted that the proposed use of the boathouse as a residential apartment would necessitate alterations. [362-365]

CIVIL ACTION commenced in the Land Court Department on October 22, 1996.

The case was heard by *Leon J. Lombardi,* J.

[1]Trustee of the Bradford M. Davis Trust.

[2]Diana D. Kornet, Helen Chase Preston, Mary Allison Booth, Edward A. Davis, II, Jeanne S. Gold, Biagio Conte, Gloria Conte, James A. Rourke, Virginia K. Rourke, and Marguerite Enhorning. These parties and David M. Davis shall be collectively referred to herein as the plaintiffs.

[3]The town of Chatham.

*Peter S. Farber* for the plaintiffs.

*Bruce P. Gilmore* for the defendants.

LAURENCE, J. The plaintiffs are keen recreational sailors living on Stage Island, Chatham, who describe their community as "a yachtsman's dream." Their desire to share in that dream, by converting a former Coast Guard launchway and boathouse to which they had acquired property rights, into a facility accommodating their boats for private recreational purposes, was deferred when the zoning board of Chatham (board) denied their application for a special permit to effect the conversion. The plaintiffs appealed both that denial and the application of the town of Chatham's (town) zoning by-law to the existing structures in a complaint to the Land Court. After three days of evidentiary hearings, a judge of that court dismissed the complaint and entered judgment for the board and town. The plaintiffs pursued their dream here, but it dissolves on the shoals of appellate standards.

*Factual background.* The essential facts (according to the judge, whose findings are unchallenged by the plaintiffs, and as reflected in undisputed portions of the record) are as follows. In 1936, well before the town enacted its zoning by-law, the United States Coast Guard, under a lease from the then owners, the Cabot family, constructed a boathouse and connected timber launchway on Stage Island and in Stage Harbor. The facility was intended to serve and was in fact exclusively used as a lifesaving station.[4] Except for minor maintenance, and wear and tear, the two structures remain essentially as constructed by the Coast Guard and have never been altered. The Coast Guard abandoned the facility and its lifesaving operations in 1976. The structures have not been used for any purpose since 1976 and have never been used for private boat storage or moorings or any other private recreational boating purpose. They do not

---

[4]The thirty foot by sixty foot boathouse extends ten feet seaward beyond the mean high water mark. The launchway is approximately 300 feet long, thirty feet wide at the boathouse and narrowing to twenty-two feet at its terminus, and principally consists of a sloping marine railway which submerges into the harbor, on the sides of which are narrow catwalks on pilings. Approximately 260 feet of the launchway extends seaward beyond the mean low water line.

conform dimensionally to the town's zoning by-law in numerous material respects.

In 1950, David M. Davis acquired the property (locus) on which the Coast Guard facility was sited from the Cabots and in 1979 purchased the abandoned boathouse and launchway from the United States Government. The locus is subject to an easement enjoyed by forty or more persons living on the adjacent Morris Island to access the harbor thereover for the purposes of launching and landing boats, but not entitling them to any rights to use the former Coast Guard structures. Over the years, Davis has also conveyed a number of undivided fractional interests in the locus and the boathouse to the other plaintiffs herein. Appurtenant to each such interest was the exclusive right to use a fifteen foot section of the launchway's catwalks to tie up a boat or boats (to a maximum of sixteen on each side of the launchway) "if authorized by the harbor master of the Town of Chatham."

Stage Harbor, which is part of the town's Coastal Conservancy District,[5] is a popular recreational area that is congested with craft during boating seasons. The available mooring field is fully occupied, and the town's harbor master maintains a lengthy waiting list for spaces (numbering over eighty people at the time of the hearing). Stage Harbor also is the town's most heavily concentrated shellfishing ground, attracting both commercial and recreational fishermen (all under municipal license) and is regularly seeded to maintain and enhance the shellfish population.[6]

*Procedural background.* Commencing in 1986, the plaintiffs

---

[5]The Coastal Conservancy District is an overlay district superimposed on part of the residential district in which the locus is situated. The zoning by-law states that among the purposes of the Conservancy District are protecting the area "for the propagation of fish and shellfish and for recreational purposes," preserving "the amenities of the Town," and conserving "natural conditions, wildlife and open space." Shellfishing and boating are among the permitted uses therein, but "any structures related [to boating may] not destroy the beneficial character of the . . . district." The plaintiffs presented no evidence below addressed to the issue whether their proposal would or would not destroy the district's beneficial character.

[6]The shellfish are taken while moving in the water or by digging in the tidal flats. None of the shellfishing is the result of aquaculture, i.e, the artificial cultivation of shellfish planted in trays or pens and protected by netting. See

attempted to realize their dream by a series of requests for town permission to convert the launchway for the purpose of private recreational boating. The instant litigation arose from their most recent effort, which sought a special permit "to reconstruct the 300 foot former Coast Guard pier[7] and railway facility at the site," which they presented as a change, alteration or extension of a "lawfully existing" nonconforming structure or use under G. L. c. 40A, § 6, and § V.B. of the by-law.[8] Their application proposed to (1) remove approximately 150 feet from the seaward end of the launchway; (2) narrow the width of the launchway to six feet; (3) reconstruct the remaining portion of the launchway into an elevated pier; (4) construct an extensive ramp and float system extending perpendicularly from ramps on each side of the resulting pier to a width of fifty-eight feet; and (5) construct berthing or slips along the pier for ten boats. Although the launchway would be shortened to about fifty percent of its present length under the plaintiffs' plan, the footprint of the proposed structure would be approximately 1,340 square feet larger than at present because of the increased

_Wellfleet_ v. _Glaze_, 403 Mass. 79, 81 (1988); _Pazolt_ v. _Director of the Div. of Marine Fisheries_, 417 Mass. 565, 567-568 (1994).

[7]The plaintiffs persistently characterize the launchway as a "pier," although it was never constructed, used, or licensed as anything but a launchway. The central railway ramp, which pitches downward into the water, does not meet the zoning by-law definition of a pier as an "elevated structure . . . extending beyond mean low water." Presumably, the plaintiffs wish to benefit from the conventional connotation of "pier" as "[a] platform extending from a shore over water and supported by poles or pillars used to secure . . . ships or boats." The American Heritage Dictionary of the English Language 1371 (3d ed. 1992). See _Crawford_ v. _Building Inspector of Barnstable_, 356 Mass. 174, 179-181 (1969). The zoning by-law itself distinguishes between "piers" and "boat launching ramps." See Chatham Zoning Bylaw, Article 9, §§ IV.A.2.h., 3.a., 3.d.

[8]General Laws c. 40A, § 6, provides, in pertinent part, "Pre-existing nonconforming structures . . . may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the . . . special permit granting authority . . . that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood." Section V.B. of the zoning by-law provides, in pertinent part, that "pre-existing nonconforming structures or uses may be extended, altered, or changed in use by Special Permit, provided that the Zoning Board of Appeals finds that such extension, alteration, or change will not be substantially more detrimental to the neighborhood than the existing nonconforming use."

width required to accommodate the boat mooring apparatus. No changes were proposed to the boathouse. The locus, boathouse, and launchway are located in a Coastal Conservancy District (see note 5, *supra*), in which construction of a private pier is permitted only upon a finding that it will not be detrimental to waterway safety or access, water quality, equity of interest in utilizing waterways and the protection of aesthetic values, and in which pier length is limited to eighty feet and pier width to four feet.

The board noted that the nonconforming structures at issue had gone unused since 1976. Consequently, they were no longer preexisting nonconforming structures subject to c. 40A, § 6, and could not be reestablished except under and in conformity with the zoning by-law.[9] Since the proposed pier would exceed the maximum size permitted in the zoning district, the board acknowledged that it could deny the application on that ground but decided, "in the interest of equity," to consider the matter under the statutory and regulatory provisions governing changes in lawful nonconforming uses and structures. That consideration led the board to deny the permit on the basis of its findings that

> "the proposed structure and use would be substantially more detrimental to the neighborhood than the existing nonconforming structure. The area of Stage Harbor consumed by the proposed pier and boat slips is greater than that currently occupied by the existing . . . facility. This reduction in available square footage would result in the loss of existing boat moorings in Stage Harbor. In addition, this reduction would occur in the sub-tidal area of

---

[9]Section 6 of G. L. c. 40A states that a zoning "by-law may define and regulate nonconforming uses and structures abandoned or not used for a period of two years or more." Section V.A. of the Chatham zoning by-law provides that "[a] nonconforming use which has been abandoned or discontinued for a period of two (2) years or more shall not be reestablished and any future use shall conform with the Bylaw"; and § IV.A.6.d.1 provides that "[p]re-existing *nonconforming structures and uses* in a Conservancy District [in which the structures were located] shall be subject to the nonconforming use provisions of Section V of this Bylaw" (emphasis added). Under the present statute, "discontinued" means nonuse or simple cessation of prior use for two years or more, regardless of the absence of intention to abandon the use. *Ka-Hur Enterprises, Inc.* v. *Zoning Bd. of Appeals of Provincetown*, 424 Mass. 404, 406-407 (1977). *Bartlett* v. *Board of Appeals of Lakeville*, 23 Mass. App. Ct. 664, 666-668 (1987).

the harbor, significantly increasing the impediment to the harvesting of shellfish."

The plaintiffs appealed this decision to the Land Court in a two-part complaint. Count I (pursuant to G. L. c. 40A, § 17) challenged the board's denial of their proposed reconstruction as unsupported by evidence and based upon an improper standard. Count II (pursuant to G. L. c. 240, § 14A) sought a judicial determination that the zoning by-law allowed, as of right, their use of the existing launchway to tie up ten boats as well as the use of the boathouse, not only to store boats and boating gear but also as an apartment (for a security person, as later testified to by Davis). After a three-day trial de novo, at which eight witnesses testified and numerous exhibits were introduced into evidence, the judge found the pertinent facts as previously described, *supra* at 350-351, emphasizing in particular that the Coast Guard facility was licensed as a boathouse and timber launchway; there had been no use of the boathouse or launchway since 1976; those structures were only licensed and utilized for the Coast Guard's lifesaving operations and had never been used as a pier or for any private recreational boating purposes; the area proposed to be utilized under the plaintiffs' application would be approximately 1,340 square feet larger than the present configuration; the project would result in the loss of at least ten mooring spaces in Stage Harbor; that harbor is already congested,[10] the mooring field is fully occupied and closed to new moorings, and there were approximately eighty names on a waiting list for mooring locations; and the project would render inaccessible a large area for shell-fishing as a result of the new locations of pilings, floats, and the plaintiffs' moored boats.

On the basis of the facts found and the applicable provisions of G. L. c. 40A and the zoning by-law, the judge concluded as to count I that (1) the proposal constituted a change in use triggering the need for special permit approval under the tests of *Powers* v. *Building Inspector of Barnstable*, 363 Mass. 648, 653, 662-663 (1973); (2) the plaintiffs' contention that the board utilized an improper standard (by comparing the proposed structures to a situation of no structures at all rather than to the

---

[10]The town harbor master and assistant harbor master were of the view that the plaintiffs' proposal in fact constituted "a hazard to navigation."

existing structures) was belied by the explicit language of the board's decision; (3) the pier resulting from the proposed modification of the launchway would not conform to the dimensional requirements of the zoning by-law; and (4) the loss of moorings, increase in navigational congestion, and interference with shellfishing were significantly detrimental effects on the Stage Harbor neighborhood, any one of which constituted a permissible reason to sustain the board's decision to deny a special permit, which was neither arbitrary nor capricious.

As to count II, seeking a declaration of the plaintiffs' right to use the existing launchway and boathouse specifically for recreational boating purposes, the judge held that the launchway could not be used under the by-law as a pier to tie up the plaintiffs' boats without a special permit, even though recreational boating is a permitted activity in the Coastal Conservancy District. He also noted that the plaintiffs had admitted that the proposed use of the boathouse as a residential apartment would necessitate alterations, including raising the floor, thereby subjecting it to a special permit requirement.

*Denial of the special permit application.* On a G. L. c. 40A, § 17, appeal, review of the board's decision, while based upon de novo fact finding, is nonetheless "circumscribed. . . . [That decision] 'cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.' " *Roberts* v. *Southwestern Bell Mobile Sys., Inc.*, 429 Mass. 478, 486 (1999), quoting from *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970). Even if the record reveals that a desired special permit could lawfully be granted by the board because the applicant's evidence satisfied the statutory and regulatory criteria, the board retains discretionary authority to deny the permit, see *Gulf Oil Corp.* v. *Board of Appeals of Framingham*, 355 Mass. 275, 277-278 (1969); *Nugent* v. *Board of Appeals of Granby*, 22 Mass. App. Ct. 909, 910 (1986); *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. 32, 39 (1991), so long as that denial is not based upon a legally untenable or arbitrary and capricious ground. See *Gamache* v. *Achushnet*, 14 Mass. App. Ct. 215, 220-221 (1982); *Nugent*, 22 Mass. App. Ct. at 910-911; *Schiffone* v. *Zoning Bd. of Appeals of Walpole*, 28 Mass. App. Ct.

981, 983-984 (1990); *ACW Realty Mgt., Inc.* v. *Planning Bd. of Westfield*, 40 Mass. App. Ct. 242, 246-247 (1996).

Even when a zoning board cites no particularized reasons or any specific evidence for its denial decision, its action will be upheld, as will that of a judge affirming that action under G. L. c. 40A, § 17, if a rational basis for the denial exists which is supported by the record. See *Cefalo* v. *Board of Appeals of Boston*, 332 Mass. 178, 181 (1955); *Ferrante* v. *Board of Appeals of Northampton*, 345 Mass. 158, 162 (1962); *Brockton Pub. Mkt., Inc.* v. *Board of Appeals of Sharon*, 357 Mass. 783 (1970); *Board of Aldermen of Newton* v. *Maniace*, 429 Mass. 726, 732 (1999); *Croteau* v. *Planning Bd. of Hopkinton*, 40 Mass. App. Ct. 922, 924 (1996). So long as "any reason on which the board can fairly be said to have relied has a basis in the trial judge's findings and is within the standards of the zoning by-law and The Zoning Enabling Act, the board's action must be sustained regardless of other reasons which the board may have advanced." *S. Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. 357, 360 (1976).[11]

The board's decision easily complies with these standards. Its

---

[11]This restrained standard of review is an aspect of the overarching general principle of deferential judicial review of administrative decisions that "prevents a court from interfering with an administrative determination (regulatory or adjudicatory) unless it is shown to be arbitrary or capricious . . . or is supported by no ground which reasonable men might deem proper to support it . . . or is devoid of any conceivable ground upon which [the action] may be upheld . . . or is impossible by any reasonable construction [to] be interpreted in harmony with the legislative [or regulatory] mandate." *Conservation Comm. of Falmouth* v. *Pacheco*, 49 Mass. App. Ct. 737, 740 n.3 (2000) (internal citations omitted). The circumscribed standard of review in zoning cases also reflects "the basic rules of appellate review [of administrative action] mandating that, [i]f the agency has, in the discretionary exercise of its expertise, made a choice between two fairly conflicting views, and its selection reflects reasonable evidence, [a] court may not displace the agency's choice. . . . [I]f the question is fairly debatable . . . [a reviewing court] cannot substitute [its] judgment for that of the [agency]." *Ibid.* (internal citations omitted). See also, in the zoning context, *Subaru of New England, Inc.* v. *Board of Appeals of Canton*, 8 Mass. App. Ct. 483, 488 (1979). Judicial deference appears especially appropriate as to decisions such as that at issue here, which reflect the intimate knowledge, experience, and judgment of local officials, see *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53, 57 (1985), elected by the people (when the board consists of the selectmen) or accountable to the people through their elected representatives (when the board is appointed by the selectmen). Cf. arts. 4, 5, and 30 of the Mas-

reliance on the undesirable enlargement of the existing nonconformity that would result from the plaintiffs' proposed project would itself be sustainable.[12] A zoning policy inimical to such enlargement is consistent with the statutory mandate of G. L. c. 40A, § 6, which disfavors extensions of existing nonconformities and places the burden on parties seeking them to persuade the local authorities of the lack of substantially increased detriment resulting therefrom. Such a policy also accords with the legislative history of § 6, which demonstrates that "strict regulation of changes in nonconforming uses [and structures] is justified by policy considerations which generally favor their eventual elimination." *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. at 39 (citations omitted). Increasing a nonconformity when such an increase is not shown to be necessary can reasonably be deemed contrary to the public welfare and the appropriate utilization of land in the community

---

sachusetts Declaration of Rights; art. 89 of the Amendments to the Massachusetts Constitution; *United States* v. *Mead Corp.*, 533 U.S. 218, 229 (2001) ("[A] reviewing court has no business rejecting an [administrative] agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity . . . but is obliged to accept the agency's position if [the legislature] has not previously spoken to the point at issue and the agency's interpretation is reasonable").

[12]An equally basic and sufficient ground for the judge to have denied plaintiffs the relief they seek is their failure to have discharged their statutory and regulatory burden of proving that their project would not be substantially more detrimental to the neighborhood than the existing nonconforming use. The plaintiffs' observation that no owner of property on Stage Island objected to their special permit application is not the equivalent of affirmative proof. The transcript of the hearing before the judge is devoid of evidence presented on behalf of the plaintiffs on the subject of detriment to the neighborhood. Their position on the issue is limited to the factually erroneous assertions that the board's finding as to detriment was a mere "parroting" of the statutory standard which disguised the board's alleged application of a legally untenable standard (i.e., supposedly assuming the long unused launchway to be an unlawful structure not entitled to consideration under c. 40A, § 6, and comparing the proposed project to a situation of no existing structure at all, see *supra* at 354-355), and that "[t]here is no evidence that such use [as they propose] will de-stabilize property values in the neighborhood" (a matter of subsidiary significance to the valid enforcement of the zoning laws, see *Tranfaglia* v. *Building Commr. of Winchester*, 306 Mass. 495, 503-504 [1940]). In light of the lack of meaningful argument supported by relevant authority on this issue, the plaintiffs have failed to make an adequate appellate presentation thereon. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See notes 15 & 16, *infra*.

— recognized purposes of both the zoning statute, see St. 1975, c. 808, § 2A, and the town's zoning by-law (see *Tranfaglia* v. *Building Commr. of Winchester*, 306 Mass. 495, 503-504 [1940]) — and constitutes a valid basis for permit denial. *Ibid.* See Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, at 39 (1972) (House of Rep. Bill No. 5009) (§ 6 reflects a "unanimity of opinion among zoning and planning authorities that the ultimate objectives of zoning would be furthered by the eventual elimination of nonconformities in most cases"). Compare *Martin* v. *Board of Appeals of Yarmouth*, 20 Mass. App. Ct. 972, 973 (1985); *Asack* v. *Board of Appeals of Westwood*, 47 Mass. App. Ct. 733, 735-736 (1999) (voluntarily increasing nonconformities is disfavored under the zoning law).[13]

We are also persuaded that the board's other stated reasons for the denial of a special permit for the proposed pier — loss of mooring space in an already saturated harbor and injury to both commercial and recreational shellfishing — were rational and independently appropriate grounds for its action and were amply supported by the judge's express findings. The regulation of the appropriate uses of bodies of water within the town, the avoidance of undue concentration and congestion of vehicular traffic of any kind, the provision of public access to waterways, the protection of natural resources (which include inlets, harbors, bays, fish, and shellfish), and the preservation of community amenities and of citizens' customary means of earning a living are all valid interests which a zoning by-law is entitled to recognize and enforce and which the board's decision reflects. See St. 1975, c. 808, § 2A; Chatham Zoning Bylaw § I.B.

---

[13]The plaintiffs' contention that the Chatham zoning by-law is "permissive in spirit" because it allows changes in nonconforming uses and structures by special permit, as opposed to banning changes entirely, achieves nothing in the absence of their establishing the statutory and regulatory prerequisite of proof of the lack of substantially more detriment from the proposed structure than from the existing nonconformity. The fact of "permissiveness" has been accorded relevance only when interpreting an ambiguity in the zoning by-law. See *Murray* v. *Board of Appeals of Barnstable*, 22 Mass. App. Ct. 473, 478 (1986). We are, in any event, obliged to defer to a zoning board's reasonable interpretation and application of its own by-law. *Building Commr. of Franklin* v. *Dispatch Communications of New England, Inc.*, 48 Mass. App. Ct. 709, 713 (2000).

(both setting forth the multifarious purposes zoning regulations may permissibly seek to vindicate). See also G. L. c. 91, § 10A; G. L. c. 130, § 52 (delegating to municipal authorities the power to issue mooring and shellfishing licenses); *Commonwealth* v. *Manchester*, 152 Mass. 230, 240-244, 248-249 (1890); *Commonwealth* v. *Hilton*, 174 Mass. 29, 31-33 (1899) (fish, including shellfish, are protectable natural resources of the citizens of Massachusetts and of each community therein).[14]

In short, as the judge correctly held, the board was empowered

---

[14]See also, with particular relevance to the instant case, *Brady* v. *Board of Appeals of Westport*, 348 Mass. 515, 523-524 (1965) (alteration of a nonconforming twelve foot pier to which a few boats were tied into a large, permanent docking facility with two eighty and ninety foot long piers and associated structures, which altogether became a marina or boatyard and attracted considerable boating activity on the Westport River was such a change "in character and area" as could be prohibited as unlawful expansion of a nonconforming use under zoning by-law); *Crawford* v. *Building Inspector of Barnstable*, 356 Mass. at 179-181 (zoning by-law enforced against creation of a nonconforming 285 foot long pier by a harborside hotel/club to moor or berth numerous boats that "makes a use of the water side of the premises which is different in quality, character and kind as well as degree from that which was made of it before" [when a few boats were moored in the bay by hotel guests who came to the hotel by dinghy or were beached directly in front of the hotel], affecting "in excess of 14,000 square feet on the water side of the premises" and creating an "effect on the neighborhood . . . [which] needs no elaboration," particularly from the "large scale" increase in boating); *Golden* v. *Board of Selectmen of Falmouth*, 358 Mass. 519, 523, 526 (1970) (board could deny permit to owner of land on pond seeking to construct a channel in the adjacent tidal marsh in which to dock boats, because a municipality could apply its zoning by-law so as to protect its coastal wetlands and other "natural resources along its coastal areas," a rational and legally tenable ground on which to deny a permit); *Pazolt* v. *Director of the Div. of Marine Fisheries*, 417 Mass. at 571 ("The private property rights of coastal owners in the tidal area may be subordinate to the public's right if the public purposes are reasonably related to the protection or promotion of fishing or navigation"); *Fafard* v. *Conservation Commn. of Barnstable*, 432 Mass. 194, 200-207 & nn.14, 19 (2000) (municipalities may regulate size of piers to protect wetland and tideland areas and may do so by balancing competing interests); *S. Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. at 358-362 (board's denial of permit to fill marshland inhabited by fish and shellfish to construct a golf course was within its power to protect and prevent injury to "the neighborhood and the town" under the zoning by-law); *S. Kemble Fischer Realty Trust* v. *Board of Appeals of Concord*, 9 Mass. App. Ct. 477, 478, 480-482 (1980) (board could deny special permit to fill land in a flood plain zone on the ground that it would exacerbate water-related problems and cause "palpable damage to the surrounding area" in a conservancy district

to consider the impact of the project on the activities of other affected persons in the immediate area, whether on land or on water. The plaintiffs' contention that the board was without authority to base a decision on concerns for mooring spaces and the protection of shellfishing because mooring and shellfishing licensees "lack protected property rights in the vicinity . . . [and therefore] do not make up the 'neighborhood' for . . . Section 6" purposes, is unpersuasive, unsupported as it is by any authority or reasoned argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).[15]

The plaintiffs' argument also ignores the fact that the "neighborhood" of the Coastal Conservancy District in which the locus lies literally and explicitly encompasses the intertidal flats adjacent to Stage Island and surrounding the launchway, as well as other natural undeveloped areas including beaches,

---

and the Assabet River flood plain, notwithstanding the plaintiff's unproven assertion that the denial left it without any practical use of its property).

[15]The conclusory argument is, moreover, untenable on its merits, in light of the authorities cited in the immediately preceding paragraph and note 14, *supra*, as well as the modern law governing licenses and the ancient law recognizing the public's rights in the intertidal area. See G. L. c. 91, §§ 10A, 10C (authorizing municipal licensing of recreational and commercial moorings); G. L. c. 130, § 63 (shellfish licensee may sue anyone who takes or otherwise "disturbs" shellfish in his licensed area without his consent); *Commonwealth* v. *Alger*, 7 Cush. 53, 78-81 (1851) (all members of the public possess the right to go upon private flats for purposes of fishing and navigation under the common law public trust doctrine); *Commonwealth* v. *Manchester*, 152 Mass. at 243 (right of State citizens to take fish and shellfish in the intertidal zone is "a property right, and not a mere privilege," quoting from *McCready* v. *Virginia*, 94 U.S. 391, 395 [1877]); *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 632-638 (1979) (under the public trust doctrine the citizens of Massachusetts are entitled to the rights to use an upland owner's flats for the purposes of "free fishing" and materially unimpaired navigation); *Roslindale Motor Sales, Inc.* v. *Police Commr. of Boston*, 405 Mass. 79, 82 (1989) ("Due process requirements are implicated when licensing decisions affect a property interest . . . . To have a property interest in a license, an applicant must 'have a legitimate [statutory or regulatory] claim of entitlement to it' "); *Derby Refining Co.* v. *Board of Aldermen of Chelsea*, 407 Mass. 718, 722 (1990) ("Once a license already has issued . . . it becomes a vested property right of the licensee, and may be revoked only when due process protections are complied with"); *Foster from Gloucester, Inc.* v. *City Council of Gloucester*, 10 Mass. App. Ct. 284, 291 (1980) ("There is no longer room for doubt that a license granted under a statutory provision . . . is a property right which can be revoked only upon compliance with the requirements of procedural due process").

coastal banks, marshes, and wetlands of all types. The water-dependent activities sought to be protected by the board and the judge from the adverse impact of the proposed pier are not only legitimate subjects of zoning regulation by statute and ordinance (see *supra* at 358-359; note 14, *supra*), but actually occur in the immediate environs of the proposed pier and could properly be deemed part of its "neighborhood," as the judge correctly concluded.[16] The flexibility of the term "neighborhood" as used in G. L. c. 40, § 6, and the Chatham by-law facilitates the

---

[16]See *Building Commr. of Franklin* v. *Dispatch Communications of New England, Inc.,* 48 Mass. App. Ct. at 713 ("A zoning board of appeals is entitled to all rational presumptions in favor of its interpretation of its own by-law, [provided] there [is] a rational relation between its decision and the purpose of the regulations it is charged with enforcing") (internal quotations omitted). Although the word "neighborhood" is undefined in the zoning statute and the Chatham zoning by-law and has not been definitively construed in any appellate decision to which our attention has been directed, its mandated application to special permit determinations arising in every one of the diverse zoning districts in a municipality requires it to be viewed as an elastic, comprehensive term the specific meaning of which will depend on the facts and circumstances of each particular situation. Compare *Willard* v. *Board of Appeals of Orleans,* 25 Mass. App. Ct. 15, 23 (1987) (zoning board's decision denying a special permit to enlarge a house "gave no indication what it considered the 'neighborhood' to be. The board referred loosely to 'surrounding property owners,' but we do not know whether it had in mind the owners of lots contiguous to or across [the street] from the plaintiff's lot, [or] all the fifteen owners to whom notice of the public hearing was given . . . [or] the owners of all the other 229 lots in the subdivision which includes the plaintiff's lot, or something else"). There is nothing in the legislative history or provisions of G. L. c. 40A that suggests, as do the plaintiffs, that the necessarily expansive concept of "neighborhood" can be defined only in terms of residences and other structures and their inhabitants. "The term 'neighborhood' generally refers to the immediate environs of the subject property," Bobrowski, Massachusetts Land Use and Planning Law § 6.3.2, at 232 n.11 (1993). Such a broad meaning is reflected in numerous special permit decisions in which the zoning neighborhood or district around a proposed project and in which its likely effects were measured was described as including water, coastal areas, and wetlands. See cases cited in note 14, *supra,* and *Rockwood* v. *Snow Inn Corp.,* 409 Mass. 361, 364-370 (1991); *Lopes* v. *Peabody,* 417 Mass. 299, 300-306 (1994); *Farrugia* v. *Board of Appeals of Marshfield,* 14 Mass. App. Ct. 720, 721-722 (1982); *Fogelman* v. *Chatham,* 15 Mass. App. Ct. 585, 586-592 (1983); *Hines* v. *Planning Bd. of Edgartown,* 24 Mass. App. Ct. 344, 345-348 (1987). This accords with the guiding principle that words undefined by zoning laws and ordinances are to be construed in accordance with common understanding and usage. See *Williams* v. *Inspector of Buildings of Belmont,* 341 Mass. 188, 191 (1960); *Langevin* v. *Superintendent of Pub. Bldgs. of Worcester,* 5 Mass. App. Ct. 892, 892 (1977), and cases

exercise of the wide discretion which reviewing courts accord zoning authorities when they consider and balance localized interests of whatever kind or character (so long as such interests are relevant to the legitimate purposes of zoning) that may be affected by any proposed alteration in an existing nonconforming structure or use. Here, the specific adverse effects foreseen by the board and the judge — the existing moorings that would be displaced and the specific shellfishing areas that would be rendered inaccessible by the plaintiffs' proposed reconstruction — unquestionably were within the immediate geographic vicinity of the project and could properly be considered in the reckoning of increased neighborhood detriment.[17]

*Rights to use existing structures under the by-law.* The plaintiffs have not demonstrated any error in the judge's rejection of their demand for a declaration that they can use the existing structures (the launchway and boathouse) as a pier and

---

cited. The broad meaning commonly attributed to "neighborhood" is the "quality or state of being immediately adjacent or relatively near to something" (Webster's Third New Intl. Dictionary 1514 [1993]), or "[t]he immediate vicinity; the area near or next to a specified place" (Black's Law Dictionary 1060 [7th ed. 1999]). Cf. *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 439 (1972) ("[t]he word 'neighborhood,' as used in every day conversation . . . will sometimes, but not always, be defined by natural or other physical boundaries or by an electoral or a zoning district . . . [but a]t the very least . . . the word signifies nearness, as opposed to remoteness from" a locus).

[17]The plaintiffs assert that their proposed alterations will have "de minimis" impact on the area, because they "will be within the existing footprint except for the outer row of eight 'dolphin pilings' on either side of the pier" which do not infringe on any lot lines or property of others, because shellfisherman will have access to the area in the off-season, and because displaced mooring licensees can move elsewhere in the harbor. This position is not persuasive. Given the deference and latitude accorded zoning boards, especially in connection with denials of special permits, see *Cefalo* v. *Board of Appeals of Boston*, 332 Mass. at 181; *Board of Aldermen of Newton* v. *Maniace*, 429 Mass. at 732; *Nugent* v. *Board of Appeals of Granby*, 22 Mass. App. Ct. at 910-911, the board's (and the judge's) judgment on such an issue — essentially a qualitative matter of degree — was within their sound discretion. "[I]t is the board's evaluation of the seriousness of the problem [whether a proposed project would have only 'a minimal effect' on a potential flooding problem and therefore deserved a special permit], not the [reviewing court's] . . . which is controlling . . . [when] reasonable persons could differ as to the severity" of the potential problem. *Subaru of New England, Inc.* v. *Board of Appeals of Canton*, 8 Mass. App. Ct. at 488 (internal citations omitted). See also the authorities cited in note 11, *supra*.

a residence for recreational boating purposes without obtaining town permission. The judge's ruling can be affirmed for several reasons. Foremost, the plaintiffs' underlying premise that the existing launchway is a "pier" is unsound (see note 7, *supra*). Its use as a private pier would require a special permit under § IV.A.6.c. of the by-law.

Further, the judge found that the plaintiffs proposed to use the launchway to tie up at least ten boats (the number designated in their application to the board); that the plaintiffs could, by conveyance, entitle up to thirty-three boat owners to use the locus; that under the zoning by-law any number of boats at such a facility over nine would constitute a marina (§ II.B.63), which would be a prohibited use in that zoning district in the absence of a special permit (§ III.C.1.c.3); and that the plaintiffs had failed to present any evidence or legal basis supporting their contentions that one of the proposed ten spaces was to be reserved exclusively for governmental use or that such a reservation would provide an exemption from designation of the facility as a marina. We agree with those findings on this record.

We note, additionally, that, although the judge found insufficient evidence to support the board's statement that the plaintiffs had intended to abandon the structures on the locus,[18] he did not comment on the fact that the undisputed nonuse of the structures for many more than two years would trigger the "abandonment by discontinuance" provision of § V.A. of the by-law, as supplemented and applied to nonconforming structures by § IV.A.6.d.1, which together required any future use thereof to be in conformity with the by-law. See note 9, *supra; Murray* v. *Board of Appeals of Barnstable*, 22 Mass. App. Ct. 473, 479 (1986) (explicit cross references in zoning by-law create restrictions on otherwise unqualified provisions). That state of fact and law is itself sufficient to dispose of the plaintiffs' count II (which the judge may indeed have intended when he entered an amended judgment that mandated, "Any

---

[18]The board had stated that "the structures have been unused and abandoned for more than two years and therefore cannot be reestablished under the Chatham By-laws" (see note 9, *supra*), but had decided "in the interest of equity" to ground its decision on G. L. c. 40A, § 6, and § V.B. of the by-law, governing alterations of existing nonconforming structures.

future use of the structures [the launchway and the boathouse] is subject to the Chatham Zoning Bylaw"). See *Foley* v. *Lowell Sun Publishing Co.,* 404 Mass. 9, 11 (1989).

The plaintiffs' observation that "boating" and "outdoor recreational activities" are permitted in the Coastal Conservancy District, to support their claim to be able to attach their boats to the existing launchway, avails them naught. Their argument again fails the basic test of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), by presenting nothing to establish that "boating" — a word undefined in either the zoning statute, the zoning by-law, or any referenced Massachusetts decision — inherently includes the right to tie up, dock, or moor boats. To the contrary, the term "boating" conventionally means "[t]o travel by boat . . . [t]o ride a boat for pleasure." The American Heritage Dictionary of the English Language 209 (3d ed. 1992). The word denotes a transient activity that would not normally create a spatial or physical obstruction to the boating of others; whereas the mooring or tying of a boat to a structure is stationary and of longer duration and necessarily creates a barrier to the boating and mooring rights of others entitled thereto.[19] As the judge found, the existing launchway has never been used to moor recreational or private boats, and mooring rights in Stage Harbor are not available to all those engaged in boating but only to those who have obtained the requisite mooring licenses.[20] Thus, the absence of historical precedent confirms customary usage in not linking boating and mooring.

Finally, the use of the existing boathouse (described in the evidence as an empty, barn-like shell that is nonconforming in several material respects) as a residential dwelling unit would,

---

[19]The judge noted that the Land Court had recently reached this very conclusion — that a right of boating does not include a right of mooring — in a well-reasoned decision, *Seascape Assn., Inc.* v. *Cavaretta,* Misc. Case No. 177387 (January 13, 1999). The court there noted that "mooring," unlike "boating," involves an exclusion of others from a definitely ascertained geographic location for an indefinite, nonincidental period of time, and is therefore fundamentally different in purpose and character from "boating."

[20]Similarly, under the Chatham zoning by-law, boaters in a Coastal Conservancy District may not, absent a special permit, construct a pier, catwalk, ramp, stair, trail, boathouse, boat shelter, bridge, deck or any other physical structure convenient — or even necessary — for the use of boats and the activity of boating. See § IV.A.3.a. & d.

as proposed, entail installing a septic system and plumbing for a bathroom and a kitchen, as well as raising the lower floor to elevate it at least one foot above the "100-year flood" elevation (because the structure is also within the overlay Flood Plain District, under § IV.B.4.b. of the by-law). This proposed renovation would be impermissible without a special permit authorizing such an extensive alteration of a preexisting nonconforming use under § IV.B. of the by-law, see *Nichols* v. *Board of Zoning Appeal of Cambridge*, 26 Mass. App. Ct. 631, 632-634 (1988) — even assuming that the boathouse's long nonuse does not prohibit any future use without bringing it into dimensional conformity with the present by-law, see *supra* at 353; note 9, *supra*, and that its proposed use as a residential dwelling unit would not in fact be prohibited in the Coastal Conservancy District where the locus lies. See and compare § I.C. and §§ IV. 2. and 4. of the zoning by-law.

*Judgment affirmed.*