Kaplan, Mitchell H., J.
These consolidated cases came before the court for trial, without a jury, on June 8, 2010. One witness testified and twenty-six exhibits were received in evidence. In consideration of the testimony, exhibits, pretrial written submissions, and arguments of counsel, the court makes the following findings and rulings and orders that judgment enter for the defendant.
INTRODUCTION
These cases arise out of appeals from decisions of the Andover Zoning Board of Appeals (the “Board”) denying the plaintiffs’ applications to modify restrictions on the use of a parcel of land located at the intersection of Central and School Streets in the Town of Andover assigned the address 36 Central Street (the “Parcel” or “Lot 1”). These restrictions are contained in an earlier 1940 Decision of the Board (the “1940 Decision”) granting a special permit to use the Parcel in a manner that would otherwise violate Andover zoning by-laws then in force, and still in force today. The plaintiffs are the Trustees of the Geneva H. Killorin 1992 Trust, which owns the Parcel. The defendants are the chairperson and members of the Board and the Town of Andover. (For simplicity, the plaintiffs will hereafter be referred to as the Trust and the defendants, collectively, as the Board.) The Trust first applied for a modification of the 1940 Decision in August 2007. After two public hearings, the application was denied, without prejudice to reapply, in November 2007. The Board’s decision contained suggestions of actions that the Trust could undertake to improve its position and, presumably, increase the likelihood of favorable action by the Board, if it filed a revised application. The Trust both filed a timely appeal from that 2007 Decision to the Superior Court and began steps to act upon the Board’s suggestions. On January 10,2008, it filed a second application for modifications to the 1940 Decision. The Board held smother public hearing, but denied that application on March 24, 2008. The Trust once again appealed and that appeal was consolidated with the earlier appeal of the Board’s 2007 decision.
FINDINGS OF FACT
The relevant facts underlying this appeal are not materially in dispute. Rather, the parties’ dispute primarily involves the conclusions to be drawn from those facts.
The Parcel was originally part of a larger tract of land. In 1891 a colonial revival sfyle “summer home” (i.e., “mansion”) was constructed on that larger tract. Access to the property was then from School Street and the mansion’s address was 53 School Street. Today, this property is part of the Central Street National Register Historic District.
In 1940, and today, this area of Andover is within a district in which permitted uses under the Zoning By-Laws include only single-family residences. In 1939, the owner of the property applied to the Board for a special permit to subdivide the land into six lots and to convert the mansion into eight apartment units. In 1940, the Board issued a decision approving a special permit allowing these uses, but with a number of conditions.
*251 The mansion was to be situated on Lot 1. So long as it continued to be used as an apartment house, Lot 1 could not be further subdivided, and could contain only the mansion and a garage that could accommodate eight cars. If the mansion ceased to be used as an apartment house, Lot 1 could then be subdivided into four parcels and a single-family dwelling built on each, provided that the subdivision and buildings complied with the building and zoning regulations then in force. Thereafter, the mansion was converted into eight apartments and at some time, at least many years prior to trial (and perhaps as early as 1940), the driveway to Lot 1 was moved to Central Street and the mansion assigned its current address, 36 Central Street.
With respect to the other five lots, the 1940 Decision also included a restriction that none of those lots could be further subdivided and each could contain only one single-family residence. Each of the deeds for the Lots 1 through 6 incorporated these restrictions, for the benefit of the other five Lots, to remain in effect even if the applicable zoning by-laws were to change, and referenced the 1940 Decision. The use restrictions in the deeds, however,- stated that they would expire in 1980. In 1959, the owners of all six Lots mutually agreed to “eliminate . . . any restrictive covenants,” in particular the restriction on further subdivision of the Lots. Thereafter, there was subdivision of some of Lots 2 through 5; however, these “subdivisions” were only to adjust boundaries between the Lots. They appear to have eliminated Lot 4 by merging it into Lot 3, and each remaining Lot continues to have only one residence and to be generally of its original size (except that two lots merged into one). Modifications of the 1940 Decision to permit those “subdivisions” were, apparently, not sought, and the Board, apparently, took no steps to enforce the restrictions applicable to those subdivisions.
In 1966, Geneva Killorin and her husband acquired the Parcel. Ownership thereafter passed to the Trust. After Mrs. Killorin’s death, the Trustees sought to sell the Parcel so that the proceeds could be distributed among the beneficiaries of her will; however, the only offer that they received was predicated on Lot 1 being subdivided into two parcels, such that a new residence could be constructed on the newly created lot that did not include the mansion. This effort to sell the Parcel caused the Trustees to apply for a modification to the 1940 Decision that would permit Lot 1 to be divided into two lots — 1A and IB. The mansion would be on proposed Lot IB and continue to be an apartment house. A new residence that met all current zoning by-laws would be constructed on Lot 1A.
As noted above, the Trust’s initial application was denied by the Board, after two public hearings, in November 2007. The position expressed to the Board by the Andover Preservation Commission is notable:
The intersection of School Street and Central Street is, without a doubt, the most historically important intersection in Andover. Representative of the social and religious core of Andover, it is a center point in an architecturally and visually impressive neighborhood . . . The residence at 36 Central with its impressive stone walls, sweeping lawn and mature plantings would be irreparably damaged by subdivision of the lot. . . The Preservation Commission encourages the ZBA preserve this important property as the 1939 decision intended.
The 2007 Decision listed a number of grounds for the denial, including the Board’s conclusion that, given that the mansion would continue to have eight apartments, the original reason for the restriction that the mansion be the only dwelling on Lot 1 continues to be “as important today” as it was in 1940. The 2007 Decision also concluded that; “The conditions in the [1940 Decision] protect not only private interests but also public interests in the integrity and character of the SRA zoning district and the neighborhood in which the [Parcel] is situated.”
The 2007 Decision went on to state that the “Board ... is not unalterably opposed to modifying certain conditions in the [1940] Decision to allow a modest change to the use or configuration of the” Parcel. It then offered some suggestions to the Trust of actions it should consider before reapplying. These included: preparing architectural drawings of the proposed new residence and then having them reviewed by the An-dover Design Review Board and the Preservation Commission; consulting with abutters and other interested neighbors; and preparing a proposed historic preservation restriction that would be applied, in perpetuity to the Lots 1A and IB, if the Board granted the requested modification.
The Trust attempted to follow-up on all of the Board’s recommendations. It prepared detailed architectural drawings of four proposed configurations for the proposed subdivision and two proposed structures and presented them to the Review Board and Preservation Commission. The Review Board offered no comments. The Commission voted unanimously that it wanted the application to be denied, but selected the configuration and design that it preferred, if the Board approved the application; and also recommended that preservation restrictions be required. The Trust prepared a proposed Preservation Restriction Agreement to bind present and future owners of Lots 1A and IB. The Trust made a number of good faith efforts to meet with neighbors and interested persons, but none would meet with it. On January 10, 2008, the Trust reapplied to the Board for the modification of the 1940 Decision. It incorporated into its application the configuration and residence design preferred by the Commission and the proposed, perpetual preservation restriction.
*252 On March 24, 2008, the Board again denied the Trust’s application to modify the 1940 Decision. In its 2008 Decision, the Board explained that while it had hoped that its suggestions would enable a “consensus [to] be reached among all interested parties as to a suitable plan and appropriate mitigation measures sufficient to justify a renewed request to the Board for the relief requested” that consensus “did not emerge.” Rather, the testimony of neighbors and other interested parties “expressed grave concern that any subdivision of the Locus would negatively affect the Locus, the neighborhood, the value and enjoyment of nearby residential property and church property, and the historic characteristics of the Locus, nearby properties, and the district in which they are situated.” The Decision reported that the Board had exercised “its own independent judgment” and unanimously concluded relief from the 1940 Decision is not warranted. It based its decision on the reasons expressed in its 2007 Decision, and the following additional grounds.
The residential structure on the Locus continues to be used for eight apartments, and the condition prohibiting subdivision remains necessary to protect the area in which the Locus is situated from that increased density on the Locus. The Board also noted that the proposed subdivision of the Locus in a manner which eliminates frontage for the existing house on School Street transforms a conforming side yard setback into a non-conforming rear yard setback, therby creating a new zoning non-conformity that does not currently exist.
RULINGS OF LAW
A. G.L.c. 184, §23
The Trust argues that, by reason of the time limit for use restrictions set out in G.L.c. 184, §23, the use restrictions contained in the 1940 Decision are no longer in effect and, therefore, it was not required to apply for a modification to proceed with a subdivision of Lot 1 to create another buildable lot for a single-family dwelling that met all current zoning by-laws. The court disagrees.
§23 states, in relevant part, that:
Conditions, or restrictions, unlimited as to time, by which the title or use of real property is affected, shall be limited to the term of thirty years after the date of the deed or other instrument or the date of the probate of the will creating them. .. [with exceptions not here relevant] [emphasis supplied].
In the present case, the restrictions in question were not created by deed, other instrument, or a will. They were established in a decision of the Board granting a special permit that enabled the owner of the Parcel to undertake a use of his property — turning the mansion into an eight-unit apartment building — that would otherwise have been prohibited. In Wyman v. Zoning Board of Appeals of Grafton, 47 Mass.App.Ct. 635, 637 (1999), the Appeals Court explained that: “Conditions of a variance or a special permit are subsumed in the provisions of c. 40A and ordinances or by-laws under which they are promulgated; they are part of the zoning law to be enforced ... A condition of a variance or special permit is presumed to be inserted in the public interest, not a private interest.”
Although the deeds that ultimately created Lots 1 through 6 made reference to the 1940 Decision and included mutual use restrictions for the private mutual benefit of the owners of the Lots for a stated period of years, they did not create the use restriction on Lot 1 now in issue. That restriction arose out of the 1940 Decision and was a condition to the then owner’s right to implement a nonconforming use. Indeed, the 1940 Decision notes that Lot 1 can be further subdivided and additional single-family dwellings built, if the mansion is no longer used for an apartment house, i.e., 'used for a purpose otherwise prohibited by the zoning by-laws.
The court also finds support for its conclusion in the Supreme Judicial Court’s discussion of §23 in Patterson v. Paul, 448 Mass. 658 (2007). There, the SJC explained that “since 1887 Massachusetts law has imposed a thirty-year time limitation on land use restrictions that do not themselves contain an express limitation on duration ... A restriction on the use of land is a right to compel the person entitled to possession of the land not to use it in specified ways ... Such a restriction may be imposed by a negative easement, an equitable servitude, or a covenant running with the land.” (Internal citations and quotations omitted.) Id. at 662-63. These restrictions, i.e., the restrictions to which §23 applies, are restrictions created by deeds or other instruments, not by decisions of zoning boards of appeal granting special permits.
Moreover, §23 creates an exception to the thirty-year sunset provision for “restrictions . . . having the benefit of section thirty-two.” Those restrictions are defined in §31 and relate generally to conservation and preservation of land for various public purposes; for example a restriction “appropriate to preservation of a structure or site historically significant for its architecture, archeology or associations.” The exempted restrictions are defined, in relevant part, as restrictions “in any deed, will, or other instrument executed by or on behalf of the owner of the land or in any order of taking.” Restrictions contained in decisions of zoning boards of appeal would not therefore necessarily be included in this §32 exemption. It would be odd to have an exemption from the thirty-year limitation for restrictions intended to benefit the public if contained in an instrument signed by the owner, but not if they were imposed on the owner by a public body such as the Board.
B. G.L.c. 40A, §17
The Trust next argues that even if the restrictions set out in the 1940 Decision are still enforceable, the Board’s decision to deny its application for a modifi *253 cation is defective on its face and unreasonably whimsical, capricious or arbitrary.
The role of the Superior Court in considering an appeal from the decision of a zoning board of appeal is well established.
On a G.L.c. 40A, §17, appeal, review of the board’s decision, while based upon de novo fact finding, is nonetheless circumscribed . . . That decision cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical capricious or arbitraiy... Even if the record reveals that a desired special permit could lawfully be granted by the board because the applicant’s evidence satisfied the statutoiy and regulatoiy criteria, the board retains discretionary authority to deny the permit, ... , so long as that denial is not based upon a legally untenable or arbitraiy and capricious ground ... So long as any reason on which the board can fairly be said to have relied has a basis in the trial judge’s findings and is within the standards of the zoning by-law and The Zoning Enabling Act, the board’s action must be sustained regardless of other reasons which the board may have advanced." (Internal citations and quotations omitted.)
Davis v. Zoning Board of Chatham, 52 Mass.App.Ct. 349, 355-56 (2001).
The Trust argues that the Board’s decision is facially defective because it purportedly “required [the Trust] to achieve ‘consensus’ among neighbors and other members of the Andover community.” It did not. The 2008 Decision notes that the Board was optimistic that if the Trust followed the suggestions that it set out in its 2007 Decision, a consensus might develop for a proposal that met both the concerns of the neighbors and other interested members of the community and the economic wishes of the Trust. That did not happen. The Board might well have been influenced by testimony from neighbors to the effect that a revised proposal met their concerns for maintaining the character of this notable intersection and traffic issues. However, as it turned out, no one from the community testified in favor of the revised application. The Board was also entitled to take this into consideration; indeed, why else would there be public hearings at which interested individuals could testify. The Board did not abdicate its responsibility and insist upon consensus, but might appropriately have been influenced had consensus been achieved. The reference to consensus building in the Decision does not render it facially invalid.
The present case is complicated by the fact that it is the existing use of the Parcel — an apartment building — that is the non-conforming use. That has been the use of the Parcel for the past seventy years. The requested additional use would meet the requirements of the applicable by-laws. In other words, the proposed subdivision of Lot 1 into Lots 1A and IB would meet all the applicable requirements for size and frontage, if each Lot were to be used for a single-family residence. The Board’s 2008 Decision states that the proposed subdivision would create a “zoning non-conformity" by transforming “a conforming side yard set back into a non-conforming rear yard set back,” because it would eliminate frontage for the mansion on School Street. The court finds this basis for the Board’s decision to be legally untenable. For decades (perhaps seven of them), the mansion has had a Central Street address. The entrance to the driveway that leads to the parking area which is adjacent to the door that the tenants use is on Central Street. There is no access to the Parcel from School Street and no entrance to the mansion on its School Street facing side. Before the 1940 subdivision and renovation, access to the much larger tract was via a private way well south of what became Lot 1 and across what became Lot 5. The proposed subdivision will not move the southeast border of Lot 1, which is the border on the opposite side of the mansion from Central Street. The proposal simply cannot rationally be said to turn a side lot into a back lot. Were that the only basis for the Board’s decision, it would be inadequate. However, the fact that one of the bases for the Board’s decision is invalid does not require reversal, if other legally and factually valid grounds exist.
The question that this court must decide is whether any reason given by the Board for its denial finds support in the facts set out above and is within the standards of the by-laws or the enabling statute. The court finds that there is. The passage of time does not change the facts that, in 1940, caused the Board to conclude “that the spirit and intent of the Zoning By-Law with regard to open spaces will be preserved by the conversion of the dwelling upon said lot into an eight apartment house and the subdivision of the entire properly in accordance with this decision.” That decision included the limitation that no other dwelling be constructed on Lot 1, as long as the mansion continued to be used as an apartment house.
It was not arbitraiy and capricious in 1940 for the Board to decide that if an intense use of space associated with eight separate apartments and their attendant automobiles is continued on Lot 1, there should be no other dwellings on it. The area in which the Parcel is situated continues to be zoned only for use as single-family residences in 2010. It was not arbitrary and capricious for the Board to conclude in 2008 that: (a) “compared to typical single-family residences elsewhere on Central Street, on School Street or in the SRA District, the presence and use of the eight apartment house on the Locus generates more residents in the building, more vehicles parked on the lot, more parking spaces and impervious pavement on the Locus, more traffic to and from the Locus, and generally more associated potential adverse effects from increase population density on the Locus; (b) ”by *254 ensuring that the Locus would exceed 50,000 square feet as long as the existing structure was uses as an eight apartment housed, the Decision significantly buffered residential abutters and protected the character of the Locus and the neighborhood"; (c) “these conditions are as important today as they were when the [1940 Decision] was approved and became final”; and (d) “the conditions in the [1940 Decision] protect not only private interests but also public interests in the integriiy and character of the SRA zoning district and the neighborhood in which the Locus is situated.”
The foregoing points are clearly within the ambit of at least two of the five criteria that the Andover Zoning By-laws direct the Board to consider in acting upon a request for a special permit: “9.4.2. Criteria ... 4. Neighborhood character and social structures; and 5. Impacts on the natural environment, including, but not limited to, air and water pollution, noise, stormwa-ter runoff, and aesthetics.” Stated differently, if a landowner today approached the Board with a request to turn a large, existing single-family residence in this district into apartments, the Board could certainly condition its approval on a requirement that the land surrounding that structure be maintained as open space, even if the zoning requirements permit building single-family residences on 15,000-square-foot lots.[3]
ORDER
For the foregoing reasons, judgment shall enter for the defendant in both of these consolidated cases affirming, respectively, the 2007 and 2008 Decisions of the Board and dismissing the cases with prejudice.

 The Trust’s complaint also asserts that the Board’s enforcement of the restrictions in the 1940 Decision constitutes a taking of the Trust’s property without due process of law in violation of the United States Constitution and the Massachusetts Declaration of Rights. The Trust irrevocably waived that claim during trial. Additionally, the complaint asserted that the 2007 Decision was in error in stating that the Trust could not subdivide the Parcel into four buildable lots, as putatively permitted by the 1940 Decision, because the applicable by-laws now require 15,000 rather than 10,000 square foot minimum lot size. That issue was not addressed at trial, and in any event, the applications that give rise to the instant appeals did not suggest that the Trust was planning to discontinue using the mansion as an apartment building. The court does not consider that issue to be properly presented by either appeal for a ruling by the court, and this memorandum and order should not be construed as ruling on that issue.