SUBARU OF NEW ENGLAND, INC. *vs.* BOARD OF APPEALS
OF CANTON.

Norfolk.    May 15, 1979. — October 22, 1979.

Present: KEVILLE, BROWN, & DREBEN, JJ.

*Zoning,* Flood plain zoning; Special permit; Board of appeals: decision.

Where there was sufficient evidence to warrant a finding by a town's
    board of appeals that the proposed construction of buildings on land
    within a flood plain district would adversely affect the preservation
    of the flood control characteristics and water storage capacity of the
    district, a judge erred in annulling the board's decision to deny a
    special permit on the basis of his finding that the effect on water
    storage capacity would be minimal. [486-488]

BILL IN EQUITY filed in the Superior Court on June 5,
1974.

The suit was heard by *Mason,* J.

*Joseph H. Malloy,* Town Counsel, for the defendant.
*W. P. Colin Smith, Jr.,* for the plaintiff.

DREBEN, J. The board of appeals of Canton (board) appeals from a judgment, entered after two trials, annulling the board's decision which made approval of a site plan contingent on certain conditions being performed by Subaru of New England, Inc. (Subaru). The board also appeals from an interlocutory decree entered after the first trial ordering the board to issue a special permit to Subaru and to conduct further hearings on the question of site plan approval. We reverse.

We summarize the pertinent facts. Subaru applied to the board for a special permit to construct a warehouse

and office building on a parcel of land zoned for industrial purposes but which is within a flood plain district bordering on the Neponset River. The Canton zoning by-law[1] provides that there shall be no filling of land in the flood plain district within 150 feet of the center line of the Neponset River unless a special permit is issued, and also provides that no building shall be constructed in the flood plain district unless a special permit is obtained. The by-law also requires that any person seeking a special permit must submit an application to the board, and must send copies of the application with accompanying plans to the building inspector, the superintendent of public works, the board of health, and the planning board so that these officials can make "recommendations" to the board. The board, "after holding a public hearing, shall issue a permit under this section if it finds that the *use of* the lands deemed subject to seasonal or periodic flooding shall not be used for residents [*sic*] or other purposes in such a manner as to endanger the health and safety of the occupants thereof."

The board, at the request of Subaru, received material from a soils engineering firm; it also received recommendations urging disapproval of the application for a special permit from the planning board and the public works department of the town. The application for a special permit was denied in May, 1974. The board appended to its decision, among other documents, a letter from the public works department indicating the opposition of the engineering division of the town to Subaru's petition on a number of grounds, including that the proposed construction would deprive the town of 23.8 acre-feet of water storage, or 7.77 million gallons.

In its decision, the board pointed out that an explicit purpose of the by-law, § IIIA(1) (b), is "[t]he preservation of the flood control characteristics and water storage ca-

---

[1] Unless otherwise stated, all references are to § IIIA of the by-law which is entitled "Flood Plain District."

pacity of the Flood Plain District" and that in the board's opinion "major industrial or commercial construction upon the lands sloping to the Neponset River may, in fact, produce an adverse result on said flood control characteristics and water storage capacity." The board then made three findings on which it grounded its decision, one of which reads as follows: "It cannot be determined that the filling, excavating, altering or transferring of earth on the land in question and within 150 feet of the center line of the Neponset River will not adversely affect the preservation of the flood control characteristics and water storage capacity of the Flood Plain District."

At the first trial, which culminated in an order to the board to issue a special permit, the trial judge found that "[t]he only credible evidence . . . concerning the flood control characteristics and water storage capacity of the flood plain district was presented by the plaintiff." This evidence consisted primarily of a report and testimony of an engineer which indicated that the "principal effect" of the proposed project on the flood plain "will be to reduce available flood water storage . . . as a result of the proposed filling. A secondary but minor effect would be to increase the rate of runoff as a result of paving." The report and the testimony indicated that the plan presented to the board[2] would result in a loss of storage capacity of fifteen acre-feet. It was also shown that because of the constriction of a bridge the project would cause early flooding of the locus during small storms. Part of the report consisted of charts showing the difference in water storage capacity, at different flooding levels, of the land in its present condition, and the land as filled and built upon in accordance with the Subaru proposal.[3] The engi-

---

[2] The report and testimony were made on the basis of a plan dated December 21, 1973, although the plan actually presented to the board was dated January 15, 1974. There was evidence to the effect that there was very little difference between the two plans.

[3] One chart, Figure 1301-1, which measured volume in hundred thousand cubic feet, showed that the site in its present condition had

neer testified that for a storm which would bring the flood stage in the river to the maximum flood plain zone the proposed facility would raise the water one-quarter of an inch,[4] but that if an alternate plan developed by his firm were followed, the water would rise far less. The engineer was asked by Subaru's counsel whether it would be fair to say that the construction of the warehouse would have a minimal effect on the flood plain district. His answer was "yes," although it is not clear whether his opinion was based on the plan presented to the board or on his own alternate plan.

Based on the foregoing evidence, the trial judge found that the effect of the proposed facility on water storage capacity would be "minimal," and that the board had acted unreasonably and arbitrarily in refusing to grant Subaru a special permit. We disagree.

Under G. L. c. 40A, § 21, as in effect prior to St. 1975, c. 808, § 3, and its successor, G. L. c. 40A, § 17, a court reviewing a decision of the board denying a permit does not possess the same discretionary power as does the board, and the decision of the board can only be disturbed "if it is based 'on a legally untenable ground'. . . or is 'unreasonable, whimsical, capricious or arbitrary'. . . . To hold that a decision . . . denying a permit is arbitrary . . . whenever the board, on the facts found by the trial judge, could have granted a permit, would eliminate the board's intended discretion." *Gulf Oil Corp.* v. *Board of Appeals*

---

roughly 180,000 cubic feet of storage at the flood elevation reached by a five-year storm, but that the proposed plan would reduce storage to 20,000 cubic feet; that at a flood elevation of a twenty-five-year storm the site as presently existing had a capacity of more than 300,000 cubic feet while the proposed plan would provide storage of less than 50,000 cubic feet; and that at the flood elevation of a one hundred-year storm the site in its present condition provided more than 500,000 cubic feet of storage while the proposed plan would provide less than 100,000 cubic feet.

[4] An examination of his report indicates that this figure is an estimate of a rise in water level on the entire flood plain district of approximately 825 acres and not on the plaintiff's 2.98 acres alone.

*of Framingham*, 355 Mass. 275, 277-278 (1969). *Pender-gast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 556, 558-560 (1954).

Under the Canton by-law the board can issue a permit only if it finds that the intended use does not "endanger the health and safety of the occupants." In making such a finding the board, contrary to Subaru's contention, may take into account the purposes of the flood plain regulations and the effect of the proposal on all of the land in the flood plain district,[5] as well as on the locus and its particular occupants. See *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221, 228, 234-235 (1972), cert. denied, 409 U.S. 1108 (1973). The board must also weigh the views of specified town officials who are required by the by-law to make recommendations. All these factors, as well as the ultimate conclusion as to health and safety, involve a considerable area of discretion.[6] *Malcomb* v. *Board of Appeals of Southborough*, 361 Mass. 887, 888 (1972). S. *Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. 357, 362 (1976).

Although the judge concluded that the proposed construction would only have a minimal effect on the water storage capacity of the flood plain district, we hold that

---

[5] We note that here there is a certainty that the effect of the project will be to cause water to flow over the land of others. Compare *MacGibbon* v. *Board of Appeals of Duxbury*, 369 Mass. 512, 519 (1976).

[6] The plaintiff and the trial judge stress the fact that the zoning by-law states that the board "shall" issue a permit if it makes the necessary finding. However, "[a]t issue here are not the limits placed on the board's discretion to grant an exception once the facts warranting an exception have been established. Rather the question is whether the board was arbitrary" in the exercise of its judgment in evaluating the facts. *Zaltman* v. *Board of Appeals of Stoneham*, 357 Mass. 482, 484-485 (1970). We note that, in any event, even language which appears mandatory must be construed in the light of its purpose. *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 276 (1932). *Boston* v. *Quincy Mkt. Cold Storage & Warehouse Co.*, 312 Mass. 638, 646-647 (1942). The substance as well as the form of the regulation must be examined. See *Y. D. Dugout, Inc.* v. *Board of Appeals of Canton*, 357 Mass. 25, 31 (1970).

it is "the board's evaluation of the seriousness of the problem, not the judge's, which is controlling." *Copley* v. *Board of Appeals of Canton*, 1 Mass. App. Ct. 821 (1973). The evidence, see note 3 *supra*, indicates that there was a basis for the board's concern as to lost storage capacity, and that reasonable persons could differ as to the severity of danger from flooding. In such circumstances the board's decision was not arbitrary and must prevail. *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. at 560. *Cliff* v. *Board of Health of Amesbury*, 343 Mass. 58, 62 (1961). *Gulf Oil Corp.* v. *Board of Appeals of Framingham*, 355 Mass. at 277-278. *Copley* v. *Board of Appeals of Canton, supra. Board of Appeals of Southampton* v. *Boyle*, 4 Mass. App. Ct. 824, 825 (1976). See *Dowd* v. *Board of Appeals of Dover*, 5 Mass. App. Ct. 148, 154-155 (1977). We do not consider this to be one of the exceptional cases where a board can be ordered to grant a special permit. The evidence does not require a finding that the effect on water storage is minimal. Compare *MacGibbon* v. *Board of Appeals of Duxbury*, 369 Mass. 512, 519 (1976). Moreover, the evidence could be "reasonably found sufficient to constitute" a basis for concern about flooding. Compare *Mahoney* v. *Board of Appeals of Winchester*, 344 Mass. 598, 602 (1962).

The finding of the board quoted earlier in this opinion, while not in the language of the by-law which relates to the granting of a special permit, is in substance equivalent to a determination that Subaru has not met its burden of showing (see *Dowd* v. *Board of Appeals of Dover*, 5 Mass. App. Ct. at 155), that the proposed use would not endanger the health and safety of the district's residents. This finding, supported by the evidence before the trial judge, is a sufficient ground to deny the special permit.[7]

_____

[7] The board's decision denying the permit rested on three grounds. If any of the reasons can be sustained, the board's decision will be valid regardless of other reasons which the board may have advanced. S.

Since the order compelling the board to issue a permit requires reversal, we do not consider the issues relating to site plan approval. The final judgment is reversed, and a judgment is to be entered that the May, 1974, decision of the board denying a special permit did not exceed its authority.

*So ordered.*

---

*Volpe & Co.* v. *Board of Appeals of Wareham,* 4 Mass. App. Ct. at 360. "We ... do not accept the plaintiff's suggestion that we must treat all ... reasons as so far interdependent that the failure of one is the failure of all." *Id.*