Gants, J.
On August 14, 2001, the plaintiff, TCR Midatlantic/NE Properties, Inc. (“TCR”), applied to the defendant Zoning Board of Appeals of Weymouth (“ZBA”) for a special permit to build 242 units of residential housing on five lots in Weymouth. On November 28, 2001, after numerous public hearings, a ZBA member moved to grant TCR a special permit to construct this residential housing complex, with specified conditions. Three ZBA members voted in favor of the special permit, and two (Francis O’Brien and Edward Foley) voted against. Since the affirmative vote of four of the five ZBA members was needed to approve the special permit (see G.L.c. 40A, §9), TCR’s special permit application was denied. TCR has appealed that denial by bringing this action under G.L.c. 40A, §17, contending that the denial of its application for a special permit exceeded the authority of the ZBA. TCR now moves for summary judgment on its appeal. After hearing, for the reasons stated below, TCR’s motion for summary judgment is ALLOWED and the matter is remanded to the ZBA for further consideration of TCR’s special permit application in light of this decision.

BACKGROUND

On May 1,2001, TCR submitted its first application to the ZBA for a special permit to construct 259 residential units on 32 acres of land offTall Oaks Drive and Burkhall Street in Weymouth. The area selected for development is surrounded by three multifamily residential developments — Wisteria Point Condominiums, Tall Oaks Condominiums, and Magnolia Ridge Condominiums — which together contain 560 residential units.
On August 14, 2001, to address public concerns raised about the planned residential development, TRC submitted a revised application for a special permit, which reduced the number of residential units to 242. The revised application divided the proposed development into five lots;
Lot 1; Seven buildings with between four and nine units each and two buildings with 28 units each, for a total of 101 units;
Lot 2: One townhouse building with three units;
Lot 3: One townhouse building with three units;
Lot 4: One townhouse building with five units; and
Lot 5: One four-stoiy building with the remaining 130 units.
Lots 1 and 5 were zoned R-4, while lots 2, 3, and 4 were zoned R-2.[1] Under the revised plan, most of the 32 acres were to remain as undeveloped open space.
The ZBA conducted numerous public hearings regarding the revised special permit application. A number of concerns were raised about the planned development, which TCR sought to address.
1. Increase in Traffic Volume
TCR retained a transportation engineering firm, Vanasse & Associates, Inc. (“VAI”), to measure the additional traffic that would be generated by the planned development and evaluate its anticipated impact on traffic flow. To understand the traffic issues, one must first understand how traffic arising from the development was to be directed. Presently, all traffic in this area feeds onto Pleasant Street, which is a *342 heavily trafficked road leading to Route 3, mostly from Tall Oaks Drive, which intersects with Pleasant Street. Burkhall Street also intersects with Pleasant Street, but 500 feet of this road is unpaved and is not generally used to access Pleasant Street. Under the revised plan, Burkhall Street was to be closed with a gate, barring all but emergency traffic, and all traffic entering Pleasant Street was to flow through Tall Oaks Drive.
Presently, the intersection of Tall Oaks Drive with Pleasant Street is a substantial bottleneck, with a Level of Service rating (“LOS”) of “F,” meaning that the average delay suffered by a vehicle on Tall Oaks Drive seeking to enter Pleasant Street during the rush hour is more than 50 seconds. VAI determined that, if a traffic light were added to that intersection, along with left-hand turning lanes and a crosswalk for pedestrians, the Level of Service at that intersection would improve to a “D,” meaning that the average delay suffered by a motorist attempting to enter Pleasant Street from Tall Oaks Drive at rush hour would fall to between 35.1 and 55 seconds.
To be sure, the proposed new development would add considerably to the number of daily trips on Tall Oaks Drive. Relying on the VAI April 13, 2001 study, Weymouth’s Traffic Engineer estimated that approximately 1,272 average daily trips would be added to the 2,750 average daily trips on Tall Oaks Drive in April 2001, an increase of 46 percent Yet, there is no evidence in the summary judgment record contradicting the VAI report’s conclusion that the addition of a traffic light, along with the other planned traffic intersection improvements, would still reduce the waiting time of drivers seeking to enter onto Pleasant Street from Tall Oaks Drive at rush hour, despite the increased number of cars that will be entering Pleasant Street from Tall Oaks.
There is also no dispute in the record that the planned development will increase the number of daily vehicle trips on Pleasant Street, although the marginal increase in traffic deriving from this planned development is rather small — less than four percent. This small percentage increase is not surprising in view of the high existing traffic volume on Pleasant Street, the anticipated 1.5 percent increase in traffic flow over time, and the additional volume that will be generated by the anticipated construction of a new Weymouth High School on Pleasant Street and the completion of a new office complex and two office buildings at Libbey Industrial Parkway. Based on this information, Weymouth’s Traffic Engineer opined that TCR’s proposed residential development will slow traffic on Pleasant Street to some degree, both because of the new traffic light and the modest increase in traffic volume.
2. Stormwater Management
Lots 1, 2, and 3 lie on the downward slope of a large hill, with a wetland area on Lot 1 lying near the base of that hill. Surface water naturally flows downhill into the wetland area on Lot 1, and then flows further downhill onto the Linnway Street Subdivision. Under the standards set by the Massachusetts Wetland Protection Act, the Department of Environmental Protection’s (“DEP”) implementing regulations, and DEP’s Stormwater Management Policy, along with the Weymouth Wetland Regulations, the owners of property being improved must ensure that the rate of stormwater discharge flowing downhill onto adjacent properties is not increased. There is no dispute that the critical variable to prevent flooding is the rate of flow, not the volume of flow. Nor is there any dispute in this record that, with the stormwater improvements contemplated for TCR’s planned subdivision, the peak rate of flow onto the Linnway Street Subdivision in a 25-year-storm event will fall by roughly two-thirds. In reliance on this information, the Weymouth Conservation Commission issued an Order of Conditions for the planned development on January 22, 2001. While there is nothing in the summary judgment record substantively challenging the effectiveness of the proposed stormwater improvements in reducing the risk of flooding of the adjacent downhill property, the record reflects that adjacent owners of a downhill property, Jerome and Lucy Marques, are appealing to the DEP the grant of the Order of Conditions.[2]
3. Impact on the Town’s Water and Sewer System
The Weymouth Department of Public Works has established a Sewer Connection and Sewer Extension Program (“the Sewer Program”) to ensure that no sewer extension or connection permit is issued for a new residential development unless the developer agrees to perform work on the sewer system that will increase the daily capacity of the sewer system by seven times the maximum daily sewerage that will be generated by the new development. Under a similar Water Bank program, a developer must pay a one-time “water impact fee” to the Town based on the development’s estimated daily water usage. In a Memorandum of Understanding entered into between TCR and the Department of Public Works (“the MOU”), TCR agreed to undertake a sewer rehabilitation project that would essentially remove from the existing sewer system through infiltration savings more than seven times the additional sewer flow that the planned development would generate. Under the MOU, TCR also agreed to pay a water impact fee of $583,000, which is based on a fee of $10 for each of the 58,300 gallons per day of estimated water usage. There is nothing in the record to indicate that these sewer improvements and the payment of the water impact fee will not be adequate to address the additional burden on the water and sewer system imposed by the planned new development. Indeed, since the MOU was premised on a development with 274 units (rather than the 242 units currently planned), the Town will enjoy even greater *343 benefit from the MOU than the burden it anticipated when it executed that agreement.
4. School Enrollment
The summary judgment record is nearly bare of information as to the likely impact of TCR’s planned development on public school enrollment and the consequent impact on the size of the Town’s school budget. Weymouth’s Planning Director told the ZBA that between 20 and 30 children would be added to the public schools by the proposed development, but in his deposition testimony he thought that his analysis yielded an estimate of 30 to 60 additional schoolchildren.
At the public hearing on November 28, 2001, ZBA member Stanley Elkerton moved for approval of a special permit for TCR’s planned development, with eleven stated conditions, including among them the installation of a traffic light at the intersection of Pleasant Street and Tall Oaks Drive. Although three of the five members voted in favor of the motion, it was still denied, because four votes were needed for passage. The only explanation of the reasons given by the two dissenting members (O’Brien and Foley) is found in the minutes of that meeting. Each presented different reasons in opposition.
O’Brien essentially gave five reasons for voting against the special permit. First, he said that he opposed the special permit because of the impact of the proposed development on traffic, especially its impact on school transportation. Second, he thought that, with the number of two- and three-bedroom apartments proposed, there would be at least 100 new students added to the school system, increasing the Town’s school budget by at least $420,000 and perhaps as much as $1,000,000 each year. Third, he said that Burkhall Street would not likely continue to be barred by a gate, because the Fire Chief would probably order the gate to be opened, which would destroy the neighborhood. Fourth, he thought that the anticipated water use would pose a problem, regardless of the payment of the one-time water impact fee. He added that he thought it “ludicrous that any applicant can buy his way around the water problem by paying a sum of money.” ZBA Minutes at p. 36. Fifth, and finally, towards the conclusion of the meeting, O’Brien declared that he does “not believe the Town can handle a project of this size, and for that reason alone he is opposed to the application.” ZBA Minutes at p. 36.
Foley also gave five reasons for opposing the motion, most of them different from O’Brien’s. First, he said that he had a problem with the drainage plans, especially the plans for what he characterized as a “dam” that needed to be approved by the Commonwealth. Second, he said that he did not believe that TCR had met the criterion of ensuring adequate and appropriate utilities. Third, he said the size of the project would serve as a drain on the resources of the Fire Department and its fire prevention officer. Fourth, he said that the anticipated blasting of ledge would cause a significant impact on the neighborhood and the welfare of the public. Fifth, he said that the coliform count from tests taken in August 2000 and May 2001 were roughly double the normal number.
TCR filed for judicial review of the ZBA denial in Norfolk County Superior Court on December 27,2001. While this appeal was pending, TCR filed a second revised application with the ZBA for a differently configured multifamily residential community to be constructed on the same property. TCR again failed to obtain four votes in favor of this proposal on March 21,2002, resulting in its denial by the ZBA. This denial is still being administratively appealed, and is not presently before this Court. Finally, with the agreement of the parties, the Court (Borenstein, J.) on February 19, 2003 remanded the case to the ZBA to consider TCR’s settlement proposal. TCR again failed to obtain the fourth vote needed to approve its special permit, so the special permit was denied. This denial, too, is not before this Court. Again, to be clear, the only denial of the special permit by the ZBA that is before this Court on this appeal is the denial on November 28, 2001.

DISCUSSION

Standard of Review

Before this Court can review the ZBA’s decision on November 28, 2001 to deny TCR a special permit, it must first determine the appropriate scope of judicial review for such denials. General Laws chapter 40A, Section 9 provides for the issuance of special permits under a broad variety of circumstances, but this Court shall discuss only three categories of circumstances that are specified by statute:
1. Zoning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit. Special permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use. G.L.c. 40A, §9.
2. Zoning ordinances or by-laws may also provide for special permits authorizing increases in the permissible density of population or intensity of a particular use in a proposed development; provided that the . . . applicant shall, as a condition for the grant of said permit, provide certain open space, ... traffic or pedestrian improvements,... or other amenities ... Id.
3. Zoning ordinances or by-laws may provide that special permits may be granted for multi-family residential use in nonresidentially zoned areas where the public good would be served and after a finding by the special permit granting authority, *344 that such nonresidentially zoned area would not be adversely affected by such a residential use, and that permitted uses in such a zone are noxious to a multi-family use. Id.
In short, as the Appeals Court has declared, “[s]pecial permits govern that class of uses that lie between those that are prohibited and those that, because they comply with the zoning code in all detail, are allowed as of right.” Duteau v. Zoning Board of Appeals of Webster, 47 Mass.App.Ct 664, 667-68 (1999).
A party aggrieved by the denial of a special permit by the local zoning board of appeals may seek judicial review of the denial. G.L.c. 40A, §§9,17. As part of that judicial review, the court “shall hear all evidence pertinent to the authority of the board or special permit granting authority and determine the facts, and, upon the facts as so determined, annul such decision if found to exceed the authority of such board or special permit granting authority or make such other decree as justice and equity may require.” G.L.c. 40A, §17. The court’s review is de novo, and is not limited to evidence previously presented to the ZBA. Bicknell Realty Company v. Board of Appeal of Boston, 330 Mass. 676, 679 (1953).
“Under . . . G.L.c. 40A, §17, a court reviewing a decision of the board denying a permit does not possess the same discretionaiy power as does the board, and the decision of the board can only be disturbed if it is based ‘on a legally untenable ground’ ... or is ‘unreasonable, whimsical, capricious or arbitraiy’. . . To hold that a decision . . . denying a permit is arbitrary whenever the board, on the facts found by the trial judge, could have granted a permit, would eliminate the board’s intended discretion.” Old Colony Council-Boy Scouts of America v. Zoning Bd. of Appeals of Plymouth, 31 Mass.App.Ct. 46, 49 (1991), quoting Gulf Oil Corp. v. Board of Appeals of Framingham, 355 Mass. 275, 277-78 (1969), and Subaru of New England, Inc. v. Board of Appeals of Canton, 8 Mass.App.Ct. 483, 486-87 (1979). See also Roberts v. Southwestern Bell Mobile Systems, Inc., 429 Mass. 478, 486 (1999).
Pragmatically, where the developer is seeking a special permit from the ZBA or other permit-granting authority to do something that is otherwise forbidden by zoning ordinances or by-laws, such as increasing the population of a development beyond the permissible density or intensity (category 2 above), or building multi-family housing in an area that is zoned only for nonresidential use (category 3 above), judicial review of a denial of a special permit is extraordinarily circumscribed because the ZBA is given the discretion to refuse to grant the requested special dispensation. When the ZBA, in its discretion, decides that it should not create an exception to the zoning ordinance or by-laws in favor of the proposed project, the Court cannot easily conclude that the ZBA exceeded its authority in denying the special permit because the ZBA has precisely that authority. Indeed, this Court has not found any case (nor been directed to any by counsel) in which a court has found that the ZBA exceeded its authority when it refused to grant the equivalent of a variance from existing zoning ordinances or by-laws.
In the cases where the court has annulled the denial of a special permit and, at times, ordered the ZBA to grant the applicant a special permit, the applicant was legally entitled to use the land for the requested purpose but nonetheless needed a special permit to approve the specific manner in which he was developing the land to accomplish that purpose. See Cape Ann Land Development Corp. v. Gloucester, 371 Mass. 19, 24 (1976) (construction of shopping center designated as permitted use of land by statute, but special permit required for a “major project”); Quincy v. Planning Board of Tewksbury, 39 Mass.App.Ct. 17, 22-23 (1995) (construction of shopping center was a permitted use by statute, but nonetheless required a special permit). In these cases, both of which involve the application for a special permit to build a shopping center, the court found that a shopping center was a permitted use on the land and the denial of the special permit was based on a legally untenable ground, or was unreasonable, whimsical, capricious or arbitrary. Cape Ann Land Development Corp., 371 Mass, at 24; Quincy, 39 Mass.App.Ct. at 22-23. The court essentially found that, although the law permitted shopping centers to be built in this zoned area, the ZBA was essentially undercutting that law by finding excuses to prevent the developer from receiving the special permit he needed to build the shopping center. See Quincy, 39 Mass.App.Ct. at 22-23 (“judge correctly ruled that, in denying the application [for a special permit for a permitted use of the land] without reasons, the board had made no effort to impose reasonable and appropriate conditions on the permitted use”). Thus, where a development plan involves an underlying use permitted as of right by the statute, but nonetheless requires a special permit, the ZBA may only “impose reasonable conditions which do not amount, individually or collectively, to a practical prohibition of the [permitted] use.” Cape Ann Land Development Corp., 371 Mass, at 24. Stated differently, courts shall intervene when a ZBA acts as if to say, “While in theory you can build such a development in this zoned area, in practice you will never receive the special permit to build that development because we will always find a reason to justify its denial.” See Id.
Therefore, in determining the appropriate scope of review here, this Court must determine whether the special permit was akin to a site development review for a permitted use, albeit more demanding in its scrutiny (category 1), or akin to the grant of a variance for a use that is expressly not permitted by the zoning ordinances or by-laws (categories 2 and 3). To do so, this Court must examine the Weymouth Zoning By-Laws (“By-Laws”).

*345
Weymouth Zoning By-Laws

Here, 231 of the 242 residential units were proposed by TCR to be built on lots zoned R-4. Each of the three remaining lots, zoned R-2, was to contain a single, smaller townhouse building with three or five units.
According to Article VI, §120-19 of the By-Laws, the Town, in establishing Resident District R-4, intended “(t]o establish and preserve a multiple-family-dwelling district whose density would be comparable with existing multiple-family-dwelling characteristics within the Town of Weymouth and to provide varied housing opportunities." By-Laws, Article VI, § 120-19. This section specifically adds, “It is further intended that the R-4 District provide for high-rise structures with appropriate site planning.” Id. “A building or group of buildings for occupancy by two or more families in separate dwelling units” is a permitted use in District R-4, regardless of the square footage of the structures. By-Laws, Article VI, §120-20. Certain non-residential uses are also permitted, but only on lots of less than 40,000 square feet containing structures with a gross floor area of less than 20,000 square feet. Id.
All buildings with between five and nineteen dwelling units in the R-4 District must undergo a site plan review under Article XXVA, §120-123(E)(3)(a). All buildings or group of buildings for occupancy by twenty or more families require a special permit. By-Laws, Article VI, §120-21.1(A); Article V, §120-18(C).
The By-Laws require a special permit for some non-permitted uses, such as non-residential uses that exceed the permitted lot size or floor square footage, and for some permitted uses, such as apartment buildings with twenty or more dwelling units, and hotels that satisfy the lot size and floor square footage limits. By-Laws, Article VI, § 120-21.1; Article V, § 120-18. All special permits must meet the same criteria;
The special permit granting authority may approve any such application for a special permit only if it finds that, in its judgment, all of the following conditions are met:
(1) The specific site is an appropriate location for such a use.
(2) The use involved will not be detrimental to the established or future character of the neighborhood or town.
(3) There will be no nuisance or serious hazard to vehicles or pedestrians.
(4) Adequate and appropriate facilities will be provided for the proper operation of the proposed use.
(5) The public convenience and welfare will be substantially served.
By-Laws, Article V, §120-18(C). It is plain that no special permit may issue unless all of these five conditions have been met by the proposed development. What is less plain is whether a special permit must issue if all the five conditions have reasonably been met.
The ZBA essentially makes two arguments. First, it contends that the use of the word “may,” in Article V, §120-18(C), demonstrates that the special permit granting authority retains the authority to deny a special permit even if all the five conditions have been met to perfection and there is no other good reason for the denial. The use of the word “may,” however, cannot be viewed as dispositive because the statute that governs the grant of special permits, G.L.c. 40A, §9, itself declares that special permits “may be issued” in categoiy 1 circumstances. This Court knows from the shopping center cases cited above that a special permit granting authority does not have the discretion to deny a special permit when (1) the use of the property is permitted, (2) all the appropriate criteria have been met, and (3) the reasons for denying a permit are arbitrary and capricious. Consequently, for all practical purposes, when a use is otherwise permitted by the zoning by-laws, the ZBA may deny a special permit only if one of the conditions set forth in Article V, §120-18(C) has not been met or there is another non-arbitrary reason for denying the special permit. Stated differently, when a use is otherwise permitted by the zoning by-laws, credible judicial review means that the ZBA shall grant a special permit if all of the conditions set forth in Article V, § 120-18(C) have been met and there is no non-arbitrary reason to deny the special permit.
Second, the ZBA contends that construction of a residential building with twenty or more dwelling units is not a permitted use in the R-4 District, so the ZBA may essentially exercise its discretion in denying what is essentially a zoning variance. As a general rule, a statute must be interpreted “in accord with the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated and to avoid imputing a barrenness of accomplishment.” Champigny v. Commonwealth, 422 Mass. 249, 251 (1996). Where the language of aby-law is plain and unambiguous, it must be given its ordinary meaning. Commonwealth v. Brown, 431 Mass 772, 775 (2000). Here, when one looks at the plain language of the By-Laws governing the R-4 District, viewed in light of the declared intent of that provision, it is clear that all residential buildings, regardless of size and the number of units, are a permitted use in the R-4 District. To be sure, buildings with twenty or more units require a special permit, but the mere requirement of a special permit does not mean that the use is not permitted as of right. It simply means *346 that the manner in which this development is designed and built must satisfy the criteria set forth in the By-Laws to obtain a special permit, and that, as with all category 1 special permit applications, it cannot be denied arbitrarily.

Was the Denial of the Special Permit Arbitrary and Capricious?

In considering whether the denial of the special permit was arbitrary and capricious, it is necessary to keep in mind that a majority of the five member ZBA voted in favor of the special permit, and that one more vote would have been sufficient to grant it. Therefore, this Court needs to examine the reasons given by the two members who voted against the grant of the special permit, because a finding that the reasons given by either member were arbitrary and capricious would be sufficient to justify a remand to the ZBA.
In considering this issue on summary judgment, this Court is mindful that this Court must rely on the evidence in the summary judgment record, viewed in the light most favorable to the ZBA, and may give no evidentiary weight to the ZBA’s findings. See Roberts, 429 Mass, at 486. Viewing the evidence in that light, it is plain that there is no evidence in the record that supports the reasons given by Edward Foley for denying the special permit — the record is devoid of any information regarding the “dam” he was concerned about, the supposed inadequacy of utilities, the impact on the Fire Department, the effect of blasting, or the coliform count. For this reason alone, the denial of the special permit must be annulled and the matter remanded to the ZBA.
It is a far closer question whether the reasons given by Francis O’Brien find any support in the summary judgment record. To be sure, the proposed TCR development would increase slightly the amount of traffic on Pleasant Street, even though, with the addition of the traffic lights, the waiting time for those entering Pleasant Street from Tall Oaks Drive would be reduced. Creating 242 new units of residential housing would also surely increase the number of students in the Weymouth public schools, and impose an additional burden on the school budget. Adding that number of units would also increase the demand on the Town’s water and sewer system, even if the Department of Public Works is satisfied that, with the sewer improvements that TCR agreed to pay for and its payment of the water impact fee, there will be more water and sewer capacity after the planned development is built than there is presently. The core question, since the R-4 District permits multiple-unit housing and specifically contemplates high-rise housing, is whether the risks arising from the TCR planned development are:
risks that cannot reasonably be mitigated which are inherent in building a large number of units of residential housing, or are preventable or additional risks arising from deficiencies in the plans, design, or construction of this particular project.
If the former, the denial of such a project because of inherent risks means, for all practical purposes, that a special permit will never be granted for this permitted use. If the latter, then the special permit may properly be denied, with reasonable conditions imposed “which do not amount, individually or collectively, to a practical prohibition of the use.” Cape Ann Land Development Corp., 371 Mass, at 24.
Since this Court remands this matter to the ZBA because of the arbitrariness of the reasons given by Foley, this Court need not decide now whether the reasons given by O’Brien would themselves be found arbitrary on this record. O’Brien is no longer a ZBA member, so the ZBA will need to revisit the question of whether a special permit is warranted without him, considering any circumstances that may have changed in the two years that have passed.
This Court has considered whether it is appropriate to order the ZBA to issue a special permit in this case, as was done in the two supermarket cases identified above. See Cape Ann Land Development Corp., 374 Mass, at 822; Quincy, 39 Mass.App.Ct. at 23. This Court concludes that any such order would be premature and that the better course is to permit the ZBA, with its new members, the opportunity to revisit TCR’s special permit application, applying the guidance regarding the applicable law given by this Court. If the special permit were again to be denied, and if this Court were to find, as the court did in Quincy and Gloucester, that the special permit granting authority acted in bad faith and effectively had prohibited a permitted use, then this Court will revisit whether such an unusual directive would be appropriate under the circumstances.

ORDER

For the reasons stated above, after hearing, this Court ORDERS that:
1. TCR’s motion for summary judgment is ALLOWED to the extent that the ZBA’s denial on November 28, 2001 of TCR’s special permit application is hereby ANNULLED and the matter is REMANDED to the ZBA for reconsideration, consistent with this decision.

Under the Weymouth Zoning Map approved at a 1999 town meeting, Lots 3, 3A, and 4 were re-zoned from R-4 to R-2. The re-zoning is presently the subject of a separate action — Gale Associates, Inc. et al v. Weymouth. Planning Board et at, Norfolk Superior Court Civil Action No. 2001-1121. Since the Court has chosen to remand TCR’s special permit application for further consideration by the ZBA, the outcome of Gale Associates, Inc. is not relevant to this decision.

Nor is there anything in the record disputing TCR’s evidence that the existing outfall pipe contained a normal and expected level of fecal coliform.